UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ ) | |
| TONY BALL ) | |
| 6234 Northwest 102 Way ) | |
| Parkland, FL 33076, ) | |
| ) | |
| ) | |
| Plaintiff ) | |
| v. ) | Civil Action No.: 07-2193 (RWR) |
| ) | |
| ) | |
| MICHAEL CHERTOFF, Secretary ) | |
| Department of Homeland Security, ) | |
| ) | |
| Defendant. ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾) | |

## <u>MEMORANDUM SUPPORTING FILING AS RELATED CASE</u>

In accordance with the Court's December 12, 2007 Order, Plaintiff Tony Ball hereby

submits this memorandum explaining why this case should be considered as "related" to *Moore,*

*et al, v. Chertoff*, C.A. 00-953 (RWR) ("*Moore"*), currently pending before this Court.

In *Moore*, a class of African American Secret Service Special Agents alleges, among

other things, that defendant has engaged in a broad pattern of race discrimination in its

promotion process, including denying black Special Agents promotional opportunities, and

placing barriers and conditions on promotions that do not exist for white Special Agents.  Tony

Ball is a member of that class.

Special Agent ("SA") Ball is exceptionally well qualified to progress into the highest

ranks of the Secret Service.  He received a football scholarship to Texas Southern University in

Houston, Texas where he obtained a bachelor's degree in business administration with a minor in

marketing.  [See Deposition of SA Ball, attached as Exhibit 1, at 8]  He served as a police officer in Houston for six years [id.], then joined the Secret Service in April 1989.  With defendant, SA Ball has served in various assignments with distinction, including both the Presidential and Vice Presidential protective details [id., at 74], as well as service in field offices, the Public Affairs Division, where he earned promotion to the GS-14 grade, and the Inspection Division.  [Exhibit 1, at 128-129].  SA Ball earned a Masters degree in Management at Johns Hopkins University as part of the Service's Executive Development Program.  [Id., at 167]

SA Ball filed an administrative complaint of race discrimination in August 2005, alleging that he had been denied promotion to the GS-15 grade, because of his race.  [See Exhibit 2, Administrative Complaint of Discrimination]  SA Ball has alleged that since June 2001, he served in "three GS-14 level job assignments," and that, notwithstanding having earned the highest rating possible -- indeed perfect scores of 50 -- in each of his GS-14 assignments, defendant required him to perform additional GS-14 assignments to be considered eligible for promotion consideration.  [Id., page 1, see also, Exhibit 1, 157-59]  SA Ball claims that "most promotions in the Secret Service to the GS-15 level require that you be assigned to only two GS-14 positions," and that "despite applying for more than 50 GS-15 level positions over the past three years, I have not been promoted." [Exhibit 2, at 1]  He also alleged that the agency placed conditions on black Special Agents (such as agreeing to move to field offices outside of their home office), that white comparators did not face:

> Since being informed that I would have to relocate to be promoted, I have found that over the last three years, all black agents who have been promoted to a GS-15 position have taken a transfer out of town.  I have found that only white agents have been promoted to a GS-15 position in-town, without moving from the Washington, D.C. area, and with only two GS-14 assignments.

[Exhibit 2, at 6]  Indeed, SA Ball has watched several white Special Agents with lesser qualifications readily promoted into the GS-15 grade, without having to perform in multiple GS-14 assignments across the country, and without having to move to another geographic location to obtain promotion.  [Id.; see also, Exhibit 1, at 157-159; 185] [1]

At the time that SA Ball filed his administrative complaint, it was not yet clear whether the *Moore* class would include alleged non-promotions to the 15 grade.  To preserve his rights under Title VII, therefore, he filed an individual complaint, but he clearly alleged a pattern of race discrimination that affected black agents in the promotion process:

> Despite having a numerical ranking system, the Secret Service employs a <u>highly subjective</u> selection procedure that allows the Secret Service to "reach down" to select candidates with lower point totals and lesser qualifications than other applicants.  The result is a personnel decision making system based on excessive subjectivity that operates as a glass ceiling to impede African American agents from entering senior management positions in the Secret Service.  The discrimination against me is representative of a pattern and practice of racial discrimination against African Americans.  These violations are systemic in nature, and adversely affect the terms and conditions of employment for African American Special Agents, thereby causing them severe psychological harm.

[Exhibit 2, at 7, emphasis in the original]

During the processing of SA Ball's administrative complaint, the agency stipulated that, if the *Moore* class litigation (which had already been filed) was construed to include denied promotions at the GS-15 level, that SA Ball would be a member of that class. [See Exhibit 3, February 22, 2007 letter among counsel in *Moore*].  The class has been interpreted in that fashion, and SA Ball is a member of that class.  Indeed, he has been the subject of unusual scrutiny by the Department in that litigation.  The Secret Service took SA Ball's deposition in the *Moore* litigation on January 24, 2007, and noticed his wife's deposition (Ramon Johnson) – even

---

[1]  SA Ball also alleged that of the eight GS-14 agents who were admitted to the Executive Development Program in his class, the six non-African American agents were promoted to the GS-15 grade, while he and the only other black agent, were not promoted.  [Exhibit 2, at 4]

though she is *not* a member of that class.  [See Exhibit 4, Notices of Deposition of SA Ball and Ramona Johnson in *Moore* litigation]  The agency has not yet taken Ms. Johnson's deposition.

In this litigation, SA Ball, and his wife in a companion case, see *Johnson v. Chertoff,* C.A. 07-2192 (RWR), allege that the Secret Service has retaliated against them by refusing to adhere to its standard practice of transferring one spouse to the same geographic location as the other, so that they can continue to live together as a family.  More specifically, in December 2005, defendant finally promoted SA Ball to the GS-15 grade [Complaint ¶ 8], but conditioned the promotion on his accepting a geographic relocation to Miami, Florida (mirroring one of the alleged acts of discrimination raised in SA Ball's complaint).  [Id.]  Initially, the agency agreed to transfer his wife Ramona Johnson to Miami so she could live with her husband and keep her job with the Service [Complaint, ¶¶ 10-20]; but when SA Ball asked for a hearing on his administrative complaint of discrimination, the agency reneged on that promise, and has kept Ms. Johnson in the District of Columbia.  Thus, SA Ball and Ms. Johnson must live apart if they want to remain employed with the Secret Service (they bought a home in Miami in reliance on the promise that Ms. Johnson would be transferred and remain employed with the Secret Service).  The Secret Service was not coy about the reason for declining the transfer; Ms. Johnson was told that she would not be transferred because her husband had "pissed off" the "Eighth Floor" (where the leadership of the department resides), and that it was a "shame" that she had to "pay for the sins" of her husband.  [Complaint, ¶¶ 22-23]  Plaintiff believes that this is direct evidence of retaliation against both SA Ball and Ms. Johnson, because of his participation in the *Moore* litigation.

Moreover, in his deposition in the *Moore* litigation, defendant not only extensively inquired of SA Ball about his allegations of racial discrimination involving his non-selections for

promotions, but also examined him about allegations in this case, that he was retaliated against by the refusal to reassign his wife. [Exhibit 1, at 213-16]   And, as noted above, Ms. Johnson was also noticed for deposition; she has not alleged that she was denied promotion and is not a member of the *Moore* class, so the deposition was obviously intended to inquire into the allegations raised in these companion lawsuits.

As the Rules of this Court explain, "cases are deemed related when the earliest is still pending on the merits in the District Court and they . . . (ii) involve common issues of fact, or (iii) grow out of the same event or transaction. . . ." [Local Rule 40.5]   This case satisfies the related case criteria.  The retaliation that plaintiff has experienced grows directly out of his participation in the *Moore* litigation, a case in which SA Ball has been an active member of the class, thus satisfying clause (iii) of the Rule.  Moreover, we understand that the Court, and in particular Magistrate Judge Robinson, has spent considerable time in hearings learning about the promotion systems at the Secret Service, and the treatment of African American Special Agents in promotion decisions.  These facts are clearly a part of Plaintiff's retaliation claims here, as they establish the good faith basis for his belief that he has been subjected to race discrimination, rendering the exercise of his rights "protected activity" under Title VII.  *See e.g., Parker v. Baltimore and Ohio RR. Co.,* 652 F.2d 1012, 1019 (D.C. Cir. 1981) (complaint of discrimination is protected so long as plaintiff had a reasonable, good faith belief that he was victim of race discrimination).

For these reasons, Plaintiff asks the Court to treat this case as "related" to the *Moore* litigation, and thus properly in this Court.   Plaintiff is still in the process of serving defendant, so Plaintiff cannot yet state whether defendant consents or objects to treating this case a related to *Moore*.

_____/s/_____
Richard A. Salzman  422497
Heller, Huron, Chertkof
Lerner, Simon & Salzman
1730 M St., NW Suite 412
Washington, DC 20036
(202) 293-8090

Counsel for Plaintiff

# COPY

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - x

REGINALD G. MOORE, et al,          :

       Plaintiffs,          :

vs.                                :    Case No: 00-953 (RWR/DAR)

MICHAEL CHERTOFF, SECRETARY,   :

U.S. DEPARTMENT OF                 :

HOMELAND SECURITY,                 :

       Defendant          :

- - - - - - - - - - - - - x

Washington, D.C.

January 24, 2007

Whereupon,

TONY BALL

the Witness, called for examination by Counsel for the

Defendant, pursuant to notice and agreement of counsel as to

time and place, at 501 3rd Street, NW, 4th Floor, Washington,

D.C., where were present on behalf of the parties:

1    experiences just prior to finding your first position outside

2    of school.  So if that was a university, if that was a

3    college, let's start there, and you can tell me where that is

4    and what degrees, and then let's move forward through your

5    career just chronologically to see where we are.

6         A.    Okay.  In 1977, I received a football scholarship to

7    Texas Southern University at Houston, Texas.  I was there for

8    five years.  Played football there for four years and received

9    a bachelor of business administration with a minor in

10   marketing.

11        Q.    What year was that?

12        A.    1982.

13        Q.    Okay.

14        A.    My first job out of college was with a supermarket

15   chain called Wine Gardens, and I was laid off from there after

16   a year.  And shortly after that became a police officer in

17   Houston.  During my career -- I was only there for six years,

18   but during that time, I trained police officers on the street

19   after they got out of the academy.

20        Q.    Now, what time frame are we talking about with

21   regard to --

22        A.    19 --

23        Q.    -- when you began the police?

24        A.    I'm sorry.  1983.

25        Q.    '83, okay.

1    '93 to '96.  And what I want to ask you about that time frame

2    is, in general, when you think back on your time in

3    Sacramento, was there any other incidents of discrimination

4    that we haven't covered or we didn't talk about?

5         A.    No.

6         Q.    So what happened after '96?  Where do you go next?

7         A.    I'm transferred to Presidential Protection Division.

8         Q.    Was this a desirable transfer for you?

9         A.    Yes.

10        Q.    And my understanding that PPD is a sought-after

11    detail; is that true in your understanding?

12        A.    Yes.

13        Q.    Okay.  If you can, maybe you could just describe to

14    me -- well, first of all, generally, how long were you in PPD?

15        A.    I was three months short of five years.

16        Q.    '96 till about 2000?

17        A.    December of 2000.

18        Q.    That sounds about right, okay.  What were your

19    assignments on PPD generally?

20        A.    The first assignment I had I was a -- part of a

21    shift.  Do you want the continuum on all the assignments I had

22    or --

23        Q.    List them and then we'll go back through them.

24        A.    I was part of the shift from March of '96 to

25    approximately March or April of '97.  I was a member of the

128

```
 1        Q.    And we may have touched upon this, but I just wanted
 2    to understand why you thought that?   You know, why did you
 3    think that this would be one more step toward the GS-14
 4    position?
 5        A.    Because when I talk about not only that division and
 6    those other three divisions that I told you that were -- that
 7    people preferred to go to, probably 80 percent of the time if
 8    you touched on one of those divisions you'd get promoted.
 9        Q.    And I was looking for your opinion here.   Do you
10    know why that is?   I mean, what was it about those positions
11    that were career enhancing?
12        A.    Most of those were high-profile positions.   Public
13    affairs you dealt with the media.   You were doing talking
14    points and speeches and stuff like that for the director or
15    you're doing talking points for other SACs or other divisions
16    who give radio, television, or print interviews.
17        Q.    Okay.   So you're actually the spokesman -- one of
18    the spokesman for the Secret Service, and that's what you did
19    --
20        A.    Yes.
21        Q.    -- while you were there?
22        A.    Yes.
23        Q.    Remind again how long were you with the public
24    affairs division?
25        A.    Seventeen months.
```

1    Q.    Seventeen months.  Now, you were promoted to the

2  GS-14 level right after that detail?

3    A.    During that detail.

4    Q.    During that detail?

5    A.    Yes.

6    Q.    Was it towards the end of that detail or towards the

7  beginning?

8    A.    It was actually June of 2001.

9    Q.    And, of course, that was a competitive bidding

10  process for the GS-14.  What position were you bidding for in

11  the GS-14 level?

12    A.    A staff assistant.

13    Q.    And just generally what were the duties with the

14  staff assistant.  And then this was in what division?  The

15  liaison division?

16    A.    Public affairs.

17    Q.    Public affairs division, okay.  And what were your

18  duties in there as a staff assistant?

19    A.    The same duties as the GS-13.  We deal with the

20  media, television, radio, print.  Provide talking points for

21  let's say the SAC of CID.  We want to talk about identity

22  theft.  The director no matter what subject he's talking

23  about.  The deputy director talking points for them.

24          We also -- during that time, we traveled with the

25  traveling press on foreign presidential travel.

157

1          So they're asking me to do twice as much as -- twice

2    as much plus leave town as -- and I named 30

3    non-African-Americans that were promoted in town.

4          Q.    Now, let's break that down a little bit.  You were

5    asked to leave to go to Los Angeles; is that right?

6          A.    Yes.

7          Q.    Were you asked to leave to go for a supervisory

8    position in Los Angeles?

9          A.    Yes, a GS-14 supervisor.

10         Q.    Understood.  Understood.  That would have been your

11   second supervisory position?

12         A.    That's correct.  But fourth GS-14.

13         Q.    I understand.  The fourth 14 assignment?

14         A.    Yes.

15         Q.    Got you.  Now, you mentioned that as a

16   discriminatory incident while you were on VPD.  Other than

17   that, were there any other discriminatory incidents while you

18   were on VPD?

19              MS. KLAR:  Objection.  Vague.  Are you asking other

20   than non-promotions or just parts of the non-promotion?

21              BY MR. PETERSON:

22         Q.    Well, in terms of the non-promotion.  You know, you

23   have discussed your disappointment with the non-promotion with

24   regard to having -- first of all, having to go to LA, and,

25   secondly, the frustration with non-promotion.  But other than

158

1  non-promotion, are there any other discriminatory incidents

2  while you were at VPD that you either witnessed or you were a

3  part of?

4      A.   No.

5      Q.   Okay.

6      A.   Can I add something just in case you're not going to

7  ask me this.

8      Q.   Go ahead.

9      A.   I mentioned a couple of names in inspection; Mark

10 Hughes, Betsy Mickilik, a couple of others.  Derek Verdeyen.

11 Now, they did a protection assignment, GS-14, and they came to

12 inspection, and they got promoted to GS-15.  So I was in

13 inspection.  I went to the VPD detail.  I did a supervisor

14 assignment.  So why shouldn't I get promoted?  That was the

15 problem I had with that.

16          I've done a supervisor assignment.  I did

17 inspection.  It's just like several other agents that I

18 mentioned that did an assignment and then inspection and got

19 promoted, but they were not promoting me for some reason.

20     Q.   You mentioned those names as other special agents

21 that had not done -- and correct me if I'm wrong -- but you

22 mentioned these names as special agents who had not had

23 supervisory -- GS-14 supervisory experience?

24          MS. KLAR:  Objection.  Mischaracterizes his

25 testimony.

159

```
 1           THE WITNESS:  No.  I was saying that they had a
 2   GS-14 supervisory assignment.  Then they came to inspection.
 3   Then they got promoted to a GS-15.
 4           BY MR. PETERSON:
 5      Q.   I see.  Okay.
 6      A.   Which is -- I did -- not in the same order, but I
 7   did a GS-14 supervisor assignment on VP.  I did inspection.
 8   But I can't promoted.  And not only that I couldn't get
 9   promoted back into inspection.
10      Q.   And tell me the people that you mentioned Betsy
11   Mickilik; is that it?
12      A.   Yeah.
13      Q.   And Mark Hughes?
14      A.   Yes.
15      Q.   And there's another person?
16      A.   Derek Verdeyen.
17      Q.   Derek Verdeyen.
18      A.   John Gill.
19      Q.   Okay, John Gill.  All right.  Anyone else?
20      A.   I have several -- I can't think of other names.
21      Q.   Any of those people -- out of those people do you
22   know if you had more years on the job than any of those
23   people?
24      A.   More years on the job?
25      Q.   Yes.
```

1          BY MR. PETERSON:

2      Q.   And I guess that's what I want to get at.  You know,

3   was the problem -- with regard to reassignments out of town at

4   the GS-14 level, was the problem that they were out of the

5   D.C. area, or just that they were another GS-14 reassignment?

6      A.   Yes.  The problem is no one has -- it's rare to see

7   anybody with three GS-14 assignments and four GS-14

8   assignments almost unheard of.  It doesn't take that many

9   assignments to get promoted, and if you look at assignments

10  that I've had, I've gotten nothing but 50s as far as scores go

11  from each division.  I've always had good write ups.

12          So there is absolutely no reason for me to take --

13  in addition to that I received the master's degree from their

14  executive development program.  There's absolutely no need for

15  me to take a fourth GS-14 assignment.

16     Q.   And I guess that's an area I wanted to talk about

17  also in terms of your scores.  I mean, as you just mentioned,

18  you're getting 50s on all -- most, if not all, of your scores.

19  Do you believe that that was a problem for you, your scoring?

20  I mean, in terms your career in the Secret Service?  Do you

21  believe that that was a problem at all?

22          MS. KLAR:  Objection.  Confusing.

23          BY MR. PETERSON:

24     Q.   Do you understand the question?

25     A.   Are you understanding a 50 is the highest that you

1  can get from the division?

2      Q.   Yes, I understand.

3      A.   So you're asking me if that was a problem?

4      Q.   I mean, you touched upon something.  I mean,

5  sometimes I may ask you to state what may appear to be

6  obvious, and I apologize for having to do that.  But we need

7  for the record just to take it clear what the issues are in

8  your mind.  And that's all I really want to do is clarify, you

9  know, when I read the record -- when anyone reads the record

10  -- people can understand what the real issue is that you have.

11          So in that vein, I'm just asking you, you know,

12  you've given me every indication that scoring in your opinion

13  was not a problem, and I'm asking you is that correct?

14      A.   That's correct.  Every GS-14 assignment I've had

15  I've gotten a 50, and that means that I've satisfied all the

16  requirements, and there are 10 different requirements in

17  there.  I've satisfied all of them.  I've gotten a five in

18  each one.  So there was never a problem.

19          So if you're going to ask me to go and do a GS --

20  another GS-14 assignment in town or out of town, you have to

21  have a reason for that.  And I didn't -- they weren't giving

22  me a reason for that.

23      Q.   And you also mentioned that you had a master's

24  degree in -- was it business?

25      A.   In management.

168

1      Q.   Management.  I'm sorry.  And where did you obtain

2 that master's degree?

3      A.   At Johns Hopkins.

4      Q.   And what was the time frame for that?  What --

5      A.   September of '02 to May of '04.  That was every

6 other Friday and Saturday.

7      Q.   Was it night classes too?

8      A.   No, it was eight hours on Friday and eight hours on

9 Saturday.

10      Q.   And that was in addition to you working --

11      A.   In inspection.

12      Q.   -- in inspection?  Okay.  All right.  Did you

13 receive any other degrees while you were in the Secret

14 Service?

15      A.   No.

16      Q.   How did you think that that master's degree would

17 help you in regard to your promotion to the GS-15 level?

18      A.   It's the Executive Development Program.  So they're

19 developing executives.

20      Q.   I understand.  So this was a part of a program

21 within the Secret Service?

22      A.   Yes.

23      Q.   Okay.  Did you have to apply to get into that

24 program?

25      A.   Yes.

184

1   well as black agents?

2       A.   Yes.

3       Q.   Well, before we leave, I'm just going to ask you is

4   there anything else about that first-level review -- you

5   talked about the unfairness that's built into it.  Was there

6   anything else about the first-level review that strikes you as

7   unfair or discriminatory or anything like that since you've

8   been a part of it just from your perspective?

9       A.   Well, now, I can definitely see if you have a

10  supervisor that wanted to exclude someone from getting a 50

11  it's easy to do, and there's not a lot of ways to -- for that

12  particular agent to grieve that or, you know, have them to

13  change it.  So if we had a supervisor that didn't want him to

14  get a 50, it could happen.

15      Q.   Right.  Just to close the gap here in the

16  progression here you were a VPD, and you were there for how

17  long again?  Is that two years?

18      A.   July of '04 to April of '06.

19      Q.   And where did you go after that?

20      A.   I got promoted to the Miami field office.

21      Q.   The GS-15 position --

22      A.   Yes.

23      Q.   -- we've been talking about?  Okay.  All right.  Of

24  course, that's something you -- I won't say of course, but

25  that particular assignment to the Miami field office was that

1    a desirable assignment in your opinion?

2        A.    It was an assignment that I bid on.

3        Q.    And by that, is it safe to say that was something

4    you wanted?  You were desiring to go to the Miami field

5    office?

6        A.    I guess you have to say that if I bid on it.

7        Q.    Okay.  At first some hesitation.

8        A.    Yeah, I mean, at the time I wanted to stay in D.C.

9        Q.    All right.  Okay.

10       A.    I wanted to be like everybody else that stayed in

11   D.C.  I didn't want to have to go down to Miami, get that high

12   interest rate, have to pay twice as much as what I paid for a

13   house.  I didn't want to have to do any of that.  And I saw

14   other agents doing it, and that's what I wanted.  But they

15   were dead set on me going to Miami.  I went.

16       Q.    Okay.  Did you think that was another aspect of

17   discrimination with regard to you personally that you were

18   sent to Miami instead of being in the D.C. area?

19       A.    It was just the same pattern that I saw with other

20   African-Americans in the last three years that got promoted to

21   GS-14 assignments -- GS-15 assignments.  They had to leave

22   town in some form, either leave as a GS-14 and come back for a

23   15, leave for a GS-14 and get promoted there, or leave D.C.

24   and get promoted to a GS-14.  But there were no GS-14

25   African-Americans that got their 13 here, the 14 and the 15 in

DEPARTMENT OF HOMELAND SECURITY

# INDIVIDUAL COMPLAINT OF EMPLOYMENT DISCRIMINATION

*(Use this form for original complaints and amendments.)*

**FOR OFFICIAL USE ONLY**

DEPARTMENT CASE NUMBER
*DHS-USS-05-0032*

FILING DATE
*AUGUST 26, 2005*

## PART 1 COMPLAINANT IDENTIFICATION

**1. NAME** *(Last, First, Middle Initial)*

*BALL, TONY, M.*

**2. TELEPHONE/FAX** *(Include Area Code)*

Home *301-725-1022*     Fax

Work *202-757-4808*     Fax

**3. HOME ADDRESS** *(You must notify the Department of any change of address while complaint is pending, or your complaint may be dismissed.)*

*7106 REDMILES RD.*
*LAUREL, MD. 20707*

**4. IF YOU ARE A CURRENT OR FORMER EMPLOYEE OF THE FEDERAL GOVERNMENT, LIST YOUR RECENT TITLE, SERIES, AND GRADE.**

Title *SPECIAL AGENT*
        *ATSAIC*

Series *GS*          Grade *14*

**5. NAME AND ADDRESS OR ORGANIZATION WHERE YOU WORK** *(If a Department of Homeland Security Employee)*

Bureau or Component *U.S. SECRET SERVICE*

RECEIVED BY:

Office and Organizational Unit
*VICE PRESIDENTIAL PROTECTIVE DIVISION*
Street Address          AUG 26 2005

City          United States Secret Service          Zip Code
                    State of ...          

**6. EMPLOYMENT STATUS IN RELATION TO THIS COMPLAINT**

☐ Applicant   ☐ Probationary   ☑ Career/Career Conditional

☐ Uniformed Service Member

☐ Former Employee/Member     Date Left Department _____

☐ Retired                    Date of Retirement _____

☐ Other *(Specify)* _____

**7. I certify that all statements made in this complaint are true, complete, and correct to the best of my knowledge and belief.**

SIGNATURE OF COMPLAINANT OR ATTORNEY REPRESENTATIVE
*Tony M. Ball*

DATE
*8/24/05*

## PART II DESIGNATION OF REPRESENTATIVE

**8. YOU MAY REPRESENT YOURSELF IN THIS COMPLAINT OR YOU MAY CHOOSE SOMEONE TO REPRESENT YOU. YOUR REPRESENTATIVE DOES NOT HAVE TO BE AN ATTORNEY. YOU MAY CHANGE YOUR DESIGNATION OF A REPRESENTATIVE AT A LATER DATE, BUT YOU MUST NOTIFY THE DEPARTMENT IMMEDIATELY IN WRITING OF ANY CHANGE, AND YOU MUST INCLUDE THE SAME INFORMATION REQUESTED IN THIS PART.**

"I hereby designate *(Please Print Name)* _*TONY M. BALL*_ to serve as my representative during the course of this complaint. I understand that my representative is authorized to act on my behalf."

Is the representative an attorney?     ☐ YES   ☑ NO

**9. REPRESENTATIVE'S MAILING ADDRESS**

FIRM/ORGANIZATION

STREET ADDRESS

CITY, STATE, & ZIP CODE

**10. REPRESENTATIVE'S EMPLOYER** *(If Federal Agency)*

**11. REPRESENTATIVE'S TELEPHONE/FAX** *(Include Area Code)*
Telephone          Fax

**12a. COMPLAINANT'S SIGNATURE**

**12b. DATE**

DHS Form 3090-1  (9/04)

ALL-STATE LEGAL®   EXHIBIT   A

Exhibit ___1___
Page _1_ of _8_

## PART III ALLEGED DISCRIMINATORY ACTIONS

| 13. NAME OF PERSON OR DHS COMPONENT WHO TOOK THE ACTION AT ISSUE. | 14. ARE YOU WILLING TO PARTICIPATE IN MEDIATION OR OTHER AVAILABLE TYPES OF ALTERNATIVE DISPUTE RESOLUTION TO RESOLVE YOUR COMPLAINT? |
|---|---|
| FIRM/ORGANIZATION<br>*U.S. SECRET SERVICE*<br>STREET ADDRESS<br>*950 H. ST. N.W.*<br>CITY, STATE, & ZIP CODE<br>*WASHINGTON, D.C. 20223* | ☐ YES    ☒ NO |

15. A. Describe the action taken against you that you believe was discriminatory.
    B. Give the date when the action occurred, and the name of each person responsible for the action.
    C. Describe how you were treated differently from other employees, applicants, or members for any of the reasons listed in item 16.
    D. Indicate what harm, if any, came to you in your work situation as a result of this action. (You may, but are not required to, attach extra sheets.)
    E. If the basis of your complaint is parental status, sexual orientation, or protected genetic information, use this form, but your complaint is not statutorily based and will follow a separate, parallel process.

*SEE ATTACHED*

16. Mark below ONLY the bases you believe were relied on to take the actions described in Item 15.

| | |
|---|---|
| ☑ RACE | ☐ AGE *(Date of Birth)* |
| ☐ COLOR | ☐ PHYSICAL OR MENTAL DISABILITY *(Describe)* |
| ☐ RELIGION | ☐ RETALIATION/REPRISAL *(Dates of Prior EEO Activity)* |
| ☐ NATIONAL ORIGIN *(Specify)* | ☐ SEXUAL ORIENTATION |
| ☐ SEX *(Specify)* | ☐ PARENTAL STATUS<br>☐ PROTECTED GENETIC INFORMATION |

17. WHAT REMEDIAL OR CORRECTIVE ACTION ARE YOU SEEKING TO RESOLVE THIS MATTER

*SEE ATTACHED*

18. ON THIS SAME MATTER, HAVE YOU FILED A GRIEVANCE OR APPEAL UNDER:

| | | |
|---|---|---|
| Negotiated grievance procedure | ☐ YES | ☑ NO |
| Agency grievance procedure | ☐ YES | ☑ NO |
| Merit Systems Protection Board appeal procedure | ☐ YES | ☑ NO |

If you filed a grievance or appeal, provide date filed, case number, and present status.

## PART IV CONTACT

**EEO/EO Counseling is not required if you are requesting amendment of an existing, open complaint.**
**Complete items 24 and 25, even if you did not contact a counselor.**

| 19. DATE YOU CONTACTED AN EEO COUNSELOR<br>*MAY 16, 2005* | 20. NAME AND TELEPHONE NUMBER OF EEO COUNSELOR<br>Name                Phone |
|---|---|
| 21. DID YOU DISCUSS ALL ACTIONS RAISED IN ITEM 15 WITH AN EEO COUNSELOR? *(If NO, explain on attached sheet)*<br>☑ YES    ☐ NO | 22. DATE YOU RECEIVED YOUR "NOTICE OF RIGHT TO FILE"<br>*AUGUST 12, 2005* |

23. IF YOU ARE REQUESTING AMENDMENT OF AN EXISTING, OPEN, FORMAL COMPLAINT (OR PROVIDING ADDITIONAL EVIDENCE), INDICATE THE COMPLAINT CASE NUMBER OF THAT COMPLAINT.

| 24. DATE OF MOST RECENT DISCRIMINATORY EVENT<br>*MAY 2005* | 25. DATE YOU FIRST BECAME AWARE OF THE ALLEGED DISCRIMINATION  *MAY 2005* |
|---|---|

Page 2 of 2

Exhibit ___1___
Page _2_ of _8_

I, Special Agent Tony M. Ball, am an African American and a 17 year veteran of the United States Secret Service. I am filing this discrimination complaint to contest the selection and promotion process. Within this promotion process, I believe I have been discriminated against because of my race. Since June of 2001, I have had three GS-14 level job assignments. I was a Staff Assistant in the Office of Public Affairs, an Assistant Inspector in the Inspection Division, and an ATSAIC in the Vice Presidential Protection Division. Most promotions in the Secret Service to the GS-15 level require that you be assigned to only two GS-14 positions. Despite applying for more than 50 GS-15 level positions over the past three years, I have not been promoted.

I have held the position as an 1811, GS-14, Staff Assistant in the Office of Public Affairs. I was assigned to the Office of Public Affairs for 17 months. This assignment is a High profile assignment. I was one of the spokesmen for the Secret Service. I have conducted television, radio, and newspaper interviews and responses on behalf of the Director of the Secret Service. I performed all the duties and tasks as they related to the Division.

My second assignment was as a GS-14, Assistant Inspector in the Inspection Division. I was assigned to Inspection Division for two years and three months. This was another high profile position. There are over 20, GS-15 positions in the division and only seven GS-14 positions. I conducted Special Investigations involving Secret Service Employees who were accused of wrong doing. Additionally, I conducted Office Inspections which involve the audit and review of ten different sections of the USSS

Exhibit ___1___
Page _3_ of _8_

manuals as they relate to that particular office. I was the Lead Inspector on as many as 10 Office Inspections during my tenure in the Inspection Division. I performed all the duties and tasks as they related to the division. Each year while assigned to the Inspection Division, I received a score of fifty out of fifty total points on the First Level Evaluation. In September of 2002, while assigned to the Inspection Division, I was chosen by my Assistant Director to participate in the First United States Secret Service Executive Development Program. This program was taught by Instructors and Lecturers from the Johns Hopkins University's School of Professional Studies in Business and Education. This program was a two-year, intensive course of study designed to develop and enhance current and future leaders within the agency. The curriculum focused on ethics and integrity, leadership and organizational behavior, financial management and budget accountability, strategic planning and crisis communications. The program required a total of 15 courses. On May 20, 2004, I received a Master's Degree in Management from Johns Hopkins University. Of the eight GS-14 agents who started the program, the six non African American agents have been promoted to GS-15 positions. I and ATSAIC Paula Reid (also African American) have not been promoted. During the initial EEO investigation, I was told by the EEO Counselor that the executive committee requested that I take two additional 8 hour supervisory classes even though I have completed 15 masters' program courses through Johns Hopkins. Under the circumstances, I consider this totally unreasonable and irregular.

My third and current assignment is as a GS-14, ATSAIC in the Vice Presidential Protection Division. I have been assigned to this Division for 13 months. My first

Exhibit _____/_____
Page____4____of____8____

assignment was as the supervisor of the Counter Surveillance Unit and the Training

Section. In the Counter Surveillance Unit I supervised 21 Special Agents and nine

Uniformed Division Officers. In the Training Section I supervised two Special Agents. I

supervised a total of 32 personnel. For 10 months I completed a work schedule every

week for both sections. This included making assignments for out of-district travel, CSU

coverage for all protectees on a twenty-four hour basis, reviewing time and attendance

work sheets, travel vouchers, monthly reports, leave requests, reviewing shooting and PT

scores, conducting evaluations and career counseling. For the past three months I have

been reassigned as a GS-14 Shift Leader on the VP Detail. This assignment is said to be

the most demanding GS-14 position in the Secret Service. The Vice President Detail is

the Second Largest Detail in the Secret Service behind the Presidents Detail. As a Shift

Leader, I conduct the above listed assignments as well as supervise a shift of agents when

the Vice President moves from his residence on both in-town and out-of-town trips.

Before being assigned to the Vice President's Detail, I was told that I needed to

take an assignment so that I could supervise a number of agents and gain more

experience as a manager in order to be promoted. At the time I pointed out that Agent

Lonnie Dehart had been promoted to a GS-15 Inspector, a position I bid on, without

having a supervisory assignment. I reluctantly took this third assignment thinking it

would make me better qualified for a GS-15 position. Since being assigned to the VP

Detail I have applied for several GS-15 positions. In May of 2005, after biding on

several GS-15 positions including a GS-15 ASAIC in Los Angeles, Ca., I received a call

from my DSAIC Mike Lee who relayed to me that Assistant Director Mark Sullivan

advised him that they were not going to promote me unless I agree to take a forth GS-14 assignment in Los Angeles, Ca. I refused to take this assignment. I was not given a valid reason why I needed to take this assignment. By asking me to take a fourth GS-14 assignment they are asking me to do twice as many assignments as any other agent to be promoted to a GS-14 position. There is no valid reason for this. I have received outstanding evaluations in all of my assignment. I have had no disagreements with my supervisors and have had no disciplinary actions or letters of reprimand in my file during my 17 years on the job.

Since being informed that I would have to relocate to be promoted, I have found that over the last three years all black agents who have been promoted to a GS-15 position have taken a transfer out of town. I have found that only white agents have been promoted to a GS-15 position in-town, without moving from the Washington, DC area, and with only two GS-14 assignments. Additionally, SA Greg Meyer was promoted to a GS-15 position, a position I bid on, with two non supervisory assignments, and never had to move. During that time I was on my third assignment with one being a supervisory assignment.

Several white male and female agents have been promoted from GS-13 to GS-14 (management level) and GS-14 to GS-15 while assigned continuously to the Washington, DC area. They include but are not limited to:

Jim Cobb; Steve Monterio; Greg Marchio; James Cawley; Russell Nelson; Mark Hughes; Gregory Neiderer; Andy Wurst; Robert West; Peter McCauley; Thomas Kelly; Craig

Bopp; David O'Connor; James Yarosh; Paul Irving; Mike Merritt; Alvin T. Smith; Tim Foley; Richard Shields; Steven Ricciardi; Cindy Rubendall-Wofford; Jane Murphy; Eileen Berry; Kathleen C. Crawely; Thomas Mazur; Daniel Donahue; James Scibilia; John Gill; David Beach; Greg Meyer; Lonnie Dehart; Cindy Marble.

The promotion decisions that have been made have unfairly discriminated me as an African American. The Secret Service has publicly claimed its commitment to a work place free from discrimination of any type, and that all policies related to non-discrimination are strictly enforced. Despite having a numerical ranking system, the Secret Service employs a <u>highly subjective selection</u> procedure that allows the Secret Service to "reach down" to select candidates with lower point totals and lesser qualifications than other applicants. The result is a personnel decision making system based on excessive subjectivity that operates as a glass ceiling to impede African American agents from entering senior management positions in the Secret Service.

The discrimination against me is representative of a pattern and practice of racial discrimination against African Americans. These violations are systemic in nature, and adversely affect the terms and conditions of employment for African American Special Agents, thereby causing them severe psychological harm.

*Tony M. Ball*

Exhibit _____1_____
Page _7_ of _8_

#17

1) To be promoted to a GS-15 position, either on VPD or any Office of my choice.
2) To have the existing loopholes removed from the merit promotion process.
3) Compensation and back pay based on my June 2002 eligibility date.
4) Strong enforcement of non-retaliation for my filing this claim.

Exhibit ___/___
Page _8_ of _8_

RELMAN & ASSOCIATES PLLC

1225 19TH STREET NW SUITE 600
WASHINGTON DC  20036-2456

TEL 202-728-1888
FAX 202-728-0848
WEBSITE WWW.RELMANLAW.COM

February 22, 2007

Edith Shine
United States Secret Service
950 H Street, NW
Suite 8300
Washington, DC 20223

Re:    *Complaint of Tony M. Ball, Agency No. DHS-USSS-05-0032, EEOC No. 570-2006-00437X*

Dear Edith,

I write to memorialize our agreement with respect to the treatment of Complainant Tony Ball's above-captioned administrative complaint pending the outcome of class certification in the Moore v. Chertoff litigation.

By your signature below, you indicate consent to this agreement as written.

*Background*:

Complainant Ball contacted an EEO counselor on May 16, 2005 and filed an administrative complaint on August 24, 2005, alleging discriminatory non-promotion to GS-15 on the basis of race.  On June 8, 2006, Complainant Ball timely filed his request for a hearing before an EEOC administrative judge.

Plaintiffs in the putative class action Moore v. Chertoff litigation have also alleged discriminatory non-promotion to GS-15 on the basis of race.  Complainant Ball's position is that he is a putative class member in the Moore litigation.

As such, Complainant Ball and Respondent Agency United States Secret Service agreed in August, 2006 to file a Joint Motion to Stay proceedings before the EEO administrative judge pending the determination of whether Complainant Ball is a class member in the Moore litigation.  Ex. A.  The parties agreed that:  if Complainant Ball is ruled to be a class member in the Moore litigation, Complainant Ball would dismiss his administrative claim and pursue his allegations as part of the Moore class action; but if a class is not certified in the Moore litigation or that class does not include Complainant Ball, Complainant would continue to pursue his claims administratively with no prejudice to his claims or rights.  *Id.*

RELMAN & ASSOCIATES

On September 6, 2006 EEOC Administrative Judge Gladys Callazo denied the parties' Joint Motion to Stay and dismissed Complainant's case without prejudice. Administrative Judge Callazo instructed: "If the federal district court certifies the class, Complainant as a putative member, will litigate his case in that forum. However, if the federal district court does not certify the class, Complainant must request reinstatement of his request for a hearing. The Agency must then resend the Report of Investigation to the Washington Field Office for processing of this complaint."

On September 29, 2006, Carmen H. Walker, Deputy Officer, Equal Employment Opportunity Programs, Office for Civil Rights and Civil Liberties, U.S. Department of Homeland Security, informed the parties by letter that due to Administrative Judge Callazo's dismissal without prejudice of Complainant Ball's complaint, the Department of Homeland Security had closed the file and terminated administrative processing of the same.

*Agreement*:

After receiving Judge Callazo's Order and Ms. Walker's letter, the parties reaffirmed the same agreement represented in the Motion.

Specifically, if presiding Judge Roberts ruling on class certification in the Moore litigation establishes that Complainant Ball is a class member, Complainant will pursue his allegations as part of the Moore litigation. However, if Judge Roberts does not certify a class or certifies a class that does not include Complainant Ball, the United States Secret Service agrees that Complainant Ball may continue pursuing his claims administratively with no prejudice to his claims or rights.

Because the Department of Homeland Security has closed Complainant's file, the parties' agreement means that the Secret Service will not object to Complainant's re-filing of his above-captioned complaint and request for a hearing if re-filed within 14 days of a determination that Complainant Ball is not a class member in the Moore litigation. If Complainant is ruled not to be a class member in the Moore litigation and pursues his complaint administratively, the Secret Service will not raise any timeliness objections based on delay caused by the stay mutually agreed to in the parties' motion. The parties agree that any time period by which Complainant Ball may have to file a new complaint and/or request a hearing will be tolled until Judge Roberts rules on whether Complainant Ball is a member of the Moore class.

2

RELMAN & ASSOCIATES

The parties concur that this agreement is in the interest of judicial efficiency and the resources of both parties.

Sincerely,

Jennifer I. Klar
*Counsel for Complainant Tony Ball*

Edith Shine
*Counsel for Respondent Agency*
*United States Secret Service*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Reginald Moore, et al. | ) |
| Plaintiffs, | ) |
| | ) |
| | )    Civil Action No. |
| | )    00-CV-0953 (RWR/DAR) |
| v. | ) |
| | ) |
| Michael Chertoff, Secretary | ) |
| Department of Homeland | ) |
| Security | ) |
| | ) |
| Defendant. | ) |

## NOTICE OF DEPOSITION

PLEASE TAKE NOTICE that the defendant hereby notices the deposition of

Anthony Ball.  The deposition will take place at 10:00 a.m. at the United States

Attorney's Office for the District of Columbia, Civil Division, 501 Third Street, NW,

Fourth Floor, Washington, D.C. 20530 on January 24, 2007.  The deposition will be

taken under oath before a court reporter by stenographic means and will continue from

day to day until completed.


_____/s_____

BENTON G. PETERSON
Assistant United States Attorney
Judiciary Center Building
555 4th Street, N.W. B Civil Division
Washington, D.C.  20530
(202) 514-7238 514-8780 (Facsimile)
 Benton.Peterson@usdoj.gov

**Of Counsel:**
Edith Shine
Donna L. Cahill
U.S. Secret Service
Office of the Chief Counsel

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Notice of Deposition has been sent by

first-class mail, postage prepaid and electronic mail this __30th__ day of November, 2006 to:


E. Desmond Hogan
Deborah L. Boardman
Hogan & Hartson
Columbia Square
555 Thirteenth Street, N.W.
Washington, D.C.  20004-1109


and


John P. Relman, Esq.
Jennifer I. Klar, Esq.
Relman & Associates PLLC
1225 Nineteenth Street, N.W.
Suite 600
Washington, DC 20036


_____/s_____
BENTON G. PETERSON Bar # 1029849
Assistant United States Attorney
United States Attorney's Office
Judiciary Center - Civil Division
555 Fourth Street, N.W.
Washington, D. C. 20530
(202) 514-7238

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Reginald Moore, et al.<br>Plaintiffs, | )<br>)<br>) | |
| | )<br>) | Civil Action No.<br>00-CV-0953 (RWR/DAR) |
| v. | )<br>) | |
| Michael Chertoff, Secretary<br>Department of Homeland<br>Security | )<br>)<br>)<br>) | |
| Defendant. | )<br>) | |

### NOTICE OF DEPOSITION

PLEASE TAKE NOTICE that the defendant hereby notices the deposition of

Ramona Johnson.  The deposition will take place at 10:00 a.m. at the United States

Attorney's Office for the District of Columbia, Civil Division, 501 Third Street, NW,

Fourth Floor, Washington, D.C. 20530 on January 26, 2007.  The deposition will be

taken under oath before a court reporter by stenographic means and will continue from

day to day until completed.

_____/s_____
BENTON G. PETERSON
Assistant United States Attorney
Judiciary Center Building
555 4th Street, N.W. B Civil Division
Washington, D.C.  20530
(202) 514-7238 514-8780 (Facsimile)
 Benton.Peterson@usdoj.gov

**Of Counsel:**
Edith Shine
Donna L. Cahill
U.S. Secret Service
Office of the Chief Counsel

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Notice of Deposition has been sent by

first-class mail, postage prepaid and electronic mail this _30th____ day of November, 2006 to:


E. Desmond Hogan
Deborah L. Boardman
Hogan & Hartson
Columbia Square
555 Thirteenth Street, N.W.
Washington, D.C.  20004-1109


and


John P. Relman, Esq.
Jennifer I. Klar, Esq.
Relman & Associates PLLC
1225 Nineteenth Street, N.W.
Suite 600
Washington, DC 20036


_____/s_____
BENTON G. PETERSON Bar # 1029849
Assistant United States Attorney
United States Attorney's Office
Judiciary Center - Civil Division
555 Fourth Street, N.W.
Washington, D. C. 20530
(202) 514-7238